# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **JAYE H. JONES** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.: 7:11-cv-00589** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL ASTRUE,** | ) | **By: Hon. Robert S. Ballou** |
| **COMMISSIONER OF SOCIAL SECURITY** | ) | **United States Magistrate Judge** |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Jaye Harlan Jones ("Jones") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") that Jones was not eligible for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. Specifically, Jones alleges the Commissioner (1) failed to properly consider the opinion of Mary Hurt, a licensed clinical social worker ("LCSW") and (2) improperly assessed Jones's credibility as to his subjective pain complaints. Jones also argues that he has presented new evidence in this action which warrants remand.

This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued the issues. The case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, the argument of counsel, and the applicable law. I conclude that substantial evidence supports the Commissioner's decision as a whole, that substantial evidence supports the weight given to the opinion of Ms. Hurt and the ALJ's assessment of Jones's credibility. I likewise conclude nothing in the new evidence Jones presents in this case warrants remand.

1

Accordingly, I **RECOMMEND DENYING** Jones's Motion for Summary Judgment (Dkt. No. 13), and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. No. 18).

## I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001).  This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that the claimant failed to demonstrate that he was disabled under the Act.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted).  The final decision of the Commissioner will be affirmed where substantial evidence supports the decision.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff bears the burden of proving that he suffers under a "disability" as that term is interpreted under the Act.  English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work.  Rather, a claimant must show that his impairments prevent engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience.  See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim.  Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[1] (4) can return to his past relevant work; and if not, (5) whether he can perform other work.  Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460-462 (1983).  The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process.  20 C.F.R. § 404.1520(a)(4).  The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability.  The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A);  Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

## Social and Vocational History

Jones was born July 22, 1960.  (Administrative Record, hereinafter "R." at 18, 45, 247, 274, 293.)  At all relevant times he has been a "younger person" under the regulations.  See 20 C.F.R. § 404.1563(c) (defining "younger person" as a person under the age of 50).  Jones is a high school graduate.  (R. 45, 258.)  He worked as a flooring installer for fifteen years, owning and operating his own floor installation business for ten of those years.  (R. 45-46, 250-51.)  This work laying and installing floors is classified as skilled, medium exertional level work.  (R. 72.)

---

[1] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).

Jones described his daily activities in a Function Report dated June 14, 2009 as fixing coffee and breakfast for his family, getting everyone to work/school, paying bills, running errands, napping, trying to accomplish at least one household task (such as dishes, laundry, etc.), helping his children with their homework, and helping with the evening meal. (R. 266.) Jones gave a substantially similar description in a Function Report dated November 11, 2009, in which he reported waking up, taking his medication, preparing breakfast and lunches for his family, sitting in a chair to watch television or read, sometimes performing light housekeeping chores, doing therapy exercises for his left shoulder three days a week, picking up his daughter from school, eating a snack, helping his child with homework, catching up with his wife when she returned home from work, sometimes helping his wife prepare dinner, studying the Bible, attending PTA meetings once a month, and watching television before bed. (R. 285.)

**Claim History**

Jones protectively filed his claims for DIB and SSI on May 5, 2009 (R. 11, 247),[2] and completed the applications for his claims on May 11, 2009. (R. 219, 223.) He claims a disability onset date of March 1, 2005. (R. 11, 219, 223, 247, 250.) The Commissioner denied his applications for DBI and SSI initially and upon reconsideration. (R. 127, 138, 145.) On May 13, 2010, an Administrative Law Judge ("ALJ") held a hearing at which Jones, represented by an attorney, testified; a vocational expert also testified. (R. 11, 27-80.)

The ALJ denied Jones's claims by written opinion dated June 24, 2011. (R. 11-20.) The ALJ found that Jones has the severe impairment of degenerative disk disease following fusion surgery in March 2007 of the C6-C7 vertebrae. (R. 13), but that this impairment did not meet or medically equal a listed impairment. (R. 15.) The ALJ found that "all other impairments other

---

[2] The protective filing date is the date a claimant first contacts the Social Security Administration about filing for benefits; it may be used to establish an earlier application date than the date which a signed application is received. See A Glossary of Social Security Terms, SocialSecuirty.gov (Jan. 14, 2013), http://www.ssa.gov/glossary.htm.

than those enumerated above, alleged and found in the record" were non-severe impairments. (R. 13.) The ALJ determined that Jones retained an RFC to perform a range of light work as defined in 20 CFR 404.1567(a) and 416.967(a) with certain limitations. Specifically, the RFC which the ALJ developed limited Jones to lifting twenty pounds occasionally and ten pounds frequently, standing and/or walking for six or more hours in an eight hour workday, and sitting for six or more hours total in an eight hour workday. The ALJ's RFC further precluded Jones from reaching overhead due to his left shoulder pain, climbing ropes, ladders, or scaffolds, and kneeling, but permitting him occasionally to climb ramps or stairs, or to kneel, crouch, or stoop. The RFC further accommodated Jones by stating he should avoid concentrated exposures to vibrations and all exposure to hazards such as moving machinery and unprotected heights. (R. 15.) The ALJ concluded, based on the testimony of the vocational expert, that Jones could not perform his past relevant work as a floor installer. (R. 18.) Nevertheless, the ALJ found that there are jobs, which exist in significant numbers in the national economy, which Jones could perform, given his age, education, work experience, and RFC, such as usher, bakery worker, and shipping and receiving weigher. (R. 18-19.) As such, the ALJ concluded that Jones is not disabled. (R. 19.)

On November 14, 2011 the Social Security Administration's Appeals Council denied Jones's request to review the ALJ's decision, thereby making the ALJ's June 24, 2011 opinion the final decision of the Commissioner. (R. 1.) This appeal followed with Jones filing his complaint in this court seeking judicial review of the ALJ's decision (Dkt. No. 1). In his complaint Jones contends that the ALJ (1) failed to consider properly the opinion of Mary Hurt, LCSW, and (2) failed to assess properly Jones's credibility as to his subjective pain complaints. Jones also argues that he has presented new evidence which warrants remand.

**III.**

**The Opinions of the Licensed Clinical Social Worker**

Jones asserts that the ALJ failed to give sufficient weight the opinion of Mary Hurt, LCSW ("Hurt"). The ALJ considered Hurt's opinion, but gave "greater weight to the objective medical evidence and the credible opinion evidence of record." (R. 14.) The ALJ noted that Hurt is not a medical doctor and that her opinion was not consistent with the objective medical evidence. (R. 14.) Because substantial evidence exists to support the weight given to Hurt's opinion, Jones's argument must fail.

<u>Hurt's Treatment Notes</u>

Jones treated with a licensed clinical social worker, Mary Hurt, from May 6, 2008 through August 25, 2011. (R. 480-81, <u>see also</u> R. 434, 541, 562.) Jones regularly saw Hurt, having approximately fifty-five office visits during this three year period. Hurt kept regular progress notes of these visits which consisted of a checklist form of the type of therapy provided and the counseling issues addressed. Hurt would also include a short summary of Jones's chief complaints, his mood, and his overall affect. These notes are handwritten and portions are illegible. During the period Hurt treated Jones, she provided supportive-directive and insight-oriented individual therapy for a number of issues, including anxiety, depression, bereavement, caregiver issues, depression, health problems, relational issues, and financial issues. (R. 448-79, 486-96, 541, 543-44, 546-51, 553-55.)

Hurt prepared a detailed case summary dated June 24, 2009 in which she identified the initial reasons Jones sought treatment in May of 2008 as marital and financial problems, along with other social stressors. By October 2008, the major stressors impacting Jones were health and financial ones as well as ongoing marital issues. Hurt identified the recent closing of Jones's

6

business as "clearly a devastating blow" and commented that Jones was "mourning this loss." Hurt developed a treatment plan consisting of individual therapy with a focus on lessening depression and stress and helping Jones envision a better future. She also stated that her observation in her office was that Jones suffers with severe chronic pain. (R. 434.)

On May 24, 2010, Hurt completed a mental residual functional evaluation. She diagnosed Jones as suffering from a major depressive disorder, recurrent, severe, and chronic pain and concluded that Jones could not physically work for more than fifteen minutes at a time. (R. 562-65.) Hurt identified in her report certain mild, moderate, marked, and extreme impairments affecting Jones and his ability to work. Specifically, Hurt stated that Jones has mild impairments (meaning he is unable to function in an area for less than 10% of the work day work week) in: (1) accepting instructions from or responding to criticism from supervisors or superiors; (2) responding appropriately to co-works or peers; (3) relating to general public and maintaining socially appropriate behavior; (4) working in cooperation with or in proximity to others without being distracted by them; and (5) remembering locations, workday procedures, and instructions. (R. 562-65.)

As to moderate impairments (meaning he is unable to function in an area for from 11% to 25% of the work day or work week), Hurt found that Jones was limited in: (1) his ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; (2) his ability to respond appropriately to changes in work setting; and (3) his ability to maintain personal appearance and hygiene. (R. 562-65.)

Hurt found marked impairments (meaning he is unable to function in an area for from 26% to 50% of the work day or work week) affecting Jones in: (1) his ability to maintain

attention and concentration for more than brief period of time; and (2) his ability to behave

predictably, reliably, and in an emotionally stable manner.  (R. 562-65.)

Finally, Hurt found Jones had extreme impairments (meaning he is unable to function in

an area over 50% of the work day or work week) in: (1) his ability to perform and complete work

tasks in a normal work day or work week at a consistent pace; (2) his ability to perform at

production levels expected by most employers; and (3) his ability to tolerate customary work

pressure.  (R. 562-65.)

Hurt completed a pain health questionnaire ("PHQ-9") dated April 19, 2011 indicating

that Jones reported that during several days during the prior two week period, he felt down,

depressed, or hopeless, felt tried or had little energy, and moved or spoke so slowly that other

people could have noticed (or the opposite—was so fidgety or restless that he was moving

around a lot more than usual).  Jones reported that these problems made it "somewhat difficult"

to do his work, take care of things at home, and get along with other people.  Hurt diagnosed

Jones with "moderate depression" on the April 19, 2011 PHQ-9.  (R. 552.)

A Burns Depression Checklist, dated July 28, 2011, indicates that Jones reported the

following types of feelings had bothered him "somewhat" over the past several days: low self-

esteem, inferiority, guilt, irritability, loss of motivation, poor self-image, and loss of sex drive.

The following types of feeling had bothered him "moderately:" sadness, discouragement, loss of

interest in life, appetite changes, and sleep changes.  Hurt noted "mild depression" on the Burns

Depression Checklist.  (R. 545.)

A PHQ-9 dated August 25, 2011 indicates that Jones had several days over the prior two

weeks with little interest or pleasure in doing things, feeling down, depressed, or hopeless,

feeling tried or having little energy, having poor appetite or overeating, and having trouble

concentrating on things, such as reading the newspaper or watching television. Jones again reported these problems made it "somewhat difficult" to do his work, take care of things at home, and get along with other people. Hurt noted "mild depression" on the August 25, 2011 PHQ-9. (R. 452.)

Analysis

As a licensed clinic social worker, Hurt is not an acceptable medical source as defined by the Act. 20 CFR §§ 404.1527(c), 416.927(c) (defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and—for limited purposes—licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). Nevertheless, the ALJ "has a duty to consider all of the evidence available in a claimant's case record, includ[ing] such evidence provided from 'other' nonmedical sources" such as licensed clinic social workers. Ingle v. Astrue, 1:10CV141, 2011 WL 5328036, at *3 (W.D.N.C. Nov. 7 2011)(citing Social Security Ruling ("SSR") 06–03p;[3] 20 CFR §§ 404.1513(d), 416.913(d)). Evidence from these non-acceptable medical sources cannot be used to establish the existence of a medically determinable impairment; nevertheless, "such sources may provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." Id. (citing SSR 06–03p; 20 CFR §§°404.1513(d), 416.913(d)); see also Ledbetter v. Astrue, 8:10–CV–00195–JDA, 2011 WL 1335840, at *10 (D.S.C. April 7, 2011) ("[O]pinions from medical sources, even when not 'acceptable medical sources,' are important and should be evaluated on key issues such as impairment severity and functional effects." (citing SSR 06–03p)). To determine the weight given to the opinion of a

---

[3] "Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (citing Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989)).

Case 7:11-cv-00589-MFU-RSB   Document 22   Filed 02/20/13   Page 9 of 24   Pageid#: 737

source who is not "acceptable medical source" as defined by the Act, the ALJ must consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. Beck v. Astrue, 3:11-CV-00711, 2012 WL 3926018, at *12 (S.D.W. Va. Sept. 7, 2012) (citing SSR 06–03p).

The ALJ rejected Hurt's opinion that Jones is physically unable to work for more than fifteen minutes at a time. (R. 14.) Jones does not contest this element of the ALJ's decision. Jones, instead, argues the ALJ "completely ignores the other opinions of [Hurt] related to [Jones's] major depressive disorder and the resulting mental limitations. Pls.' Br. 27-28. In Hurt's mental RFC dated May 24, 2010, she stated that Jones had a number of extreme and marked limitations due to his recurrent, severe, major depressive disorder. The ALJ's decision describes his consideration of Hurt's opinion as follows:

> [I have] considered [Hurt's] opinion but give[] greater weight to the objective medical evidence and the credible opinion evidence of record. Additionally, [Hurt] is not a medical doctor and her opinion is not consistent with the objective medical record. Furthermore, [I] find[] that there is no evidence in the record to support a finding that [Jones's] alleged depression and anxiety result in any severe functional limitations. This conclusion is supported by the opinions of the State agency physicians and psychologists . . . .

(R. 14.) The ALJ, therefore, looked to the opinion of medical professionals to determine if Jones's depression is a severe impairment and, based on those opinions, found that it was not. There is substantial evidence to support this finding.

The treatment notes of Dr. Alba, Jones's primary care doctor, are particularly instructive. Jones established care with Dr. Alba on April 19, 2007. (R. 431, 531.) Dr. Alba diagnosed Jones with "depression/anxiety" on February 11, 2008, but noted that he was "fairly controlled

on Cymbalta currently." (R. 424, 525.) Dr. Alba found Jones's depression and anxiety were well controlled on Cymbalta on May 13, 2008, (R. 420, 521), and August 15, 2008. (R. 418, 519.) On February 9, 2009, Jones reported that he was doing well and that "Cymbalta ha[d] definitely improved [his] overall function and outlook." (R. 412, 515.) On August 3, 2008, Jones reported to Dr. Alba that he was overall doing well with depression and anxiety but that he wanted to come off Cymbalta at some point. Dr. Alba noted that Jones was "doing well" with regards to his depression and anxiety. (R. 444, 513.) On November 2, 2009, Jones reported to Dr. Alba that his depressive symptoms were generally good. He also reported that he had stopped taking his Cymbalta. Dr. Alba diagnosed Jones with "mild depression and sleep disturbance" and prescribed Remeron. (R. 440, 509.) Six weeks later, on December 14, 2009, Jones reported to Dr. Alba that he was doing fairly on Remeron for his depressive symptoms. Jones denied worsening depression, reporting that his depression had improved. (R. 507.) Four months later, on April 12, 2010, Jones reported to Dr. Alba that he was doing fairly well over all. At this point, Dr. Alba diagnosed Jones with sleep disturbance and mild depression. (R. 505.) Although the record contains treatment notes from Dr. Alba indicating that he saw Jones on July 23, 2010, October 4, 2010, and January 4, 2011, there is no further mention of Jones's depression. Nor is there any mention of depression anywhere else in record—with the exception of Hurt's notes.

In addition to Dr. Alba's treatment notes, the state agency psychologists that reviewed Jones's medical records all found that his affective and anxiety disorders were non-severe. On August 6, 2009, Dr. Julie Jennings, PhD, found that Jones's affective and anxiety disorders were non-severe and that Jones had only mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration,

persistence, or pace. (R. 85, 95.) On February 8, 2010, Dr. Joseph Duckwell, MD, reiterated Dr. Jennings's findings. (R. 110-11, 121-22.) These treatment notes and medial opinions provide substantial evidence for the ALJ's finding that Hurt's lay opinion was "not consistent with the objective medical record." (R. 14.) Indeed, the treatment notes and opinions of the acceptable medical sources in the record all indicate that Jones's depression was far from severe, but in fact mild and well controlled with medication.

In addition to the medical opinions contained in the record, Hurt's own treatment notes do not support her opinion that Jones suffered from severe, recurrent, major depression. She characterized Jones's depression as "moderate" and then, after Jones received further treatment, as "mild." (R. 452, 545, 552.) Hurt also almost always noted that Jones's affect was appropriate as was his interaction with Hurt during treatment sessions. The notes further demonstrate that Jones was engaged in a range of daily activities. These descriptions are inconsistent with an individual who suffers from the extreme and marked limitations Hurt listed in her mental residual functional evaluation. Additionally, the ALJ specifically notes that the majority of Hurt's treatment notes relate to Jones's marital issues and the relating stress. (R. 14.) Having thoroughly reviewed the entirety of Hurt's treatment notes, I cannot find that this conclusion is unwarranted. Although Hurt and Jones discussed a range of topics, it is clear that marital strife was a constant and recurring theme in Hurt's treatment of Jones. (See, e.g., R. 448, 451, 558-61, 470, 476, 477, 479, 488, 490, 550.) Indeed, the record supports a finding that marital issues were the reason Jones initially began seeing Hurt. (R. 434, 480-81.)

Hurt's treatment notes are certainly not lacking in references to Jones's depression, physical health, or finances. The emphasis of Hurt's note and her treatment was on the stress Jones faced as result of his marital, financial, physical, and mental health issues, all of which were intertwined. The issue on appeal is not whether it is plausible that a different fact finder

12

could have drawn a different conclusion and characterized Hurt's treatment differently—as revealing some other factor(s) were Jones's "major stressors," as oppose to "marital issues" as the ALJ found. (R. 14.) The issue before me is whether substantial evidence supports the ALJ's findings with regards to Hurt's records. I find that there is such evidence. Furthermore, the records and opinions of the acceptable medical sources, and even Hurt's own treatment notes, provide substantial evidence for the weight given to Hurt's opinion. For these reasons, I can find no error.

**The ALJ's Credibility Assessment**

Jones alleges the he suffers from debilitating pain and argues that the ALJ improperly assessed his credibility as to his subjective pain complaints. The ALJ found that Jones's statements concerning his impairments and their impact on his ability to work are not entirely credible. (R. 20.) Because the ALJ's determination is supported by substantial evidence, Jones's argument must fail.

<u>Jones's Documented Pain Complaints</u>

Jones reported to his family doctor on February 2, 2005 that he had chronic back pain with an acute onset of neck pain. (R. 333.) Jones was subsequently diagnosed with a left disk herniation at C6-7,, left C7 radiculopathy, and progressive neurological deficit. (R. 313-15, 363-64, 370.) On March 1, 2005, Dr. James Leipzig performed an anterior surgical diskectomy and fusion at C6-7. (R. 365-67.) Post surgery, Jones reported significant improvement in his pain. (R. 362.) Jones was discharged from the care of his surgeon with no complaints on June 9, 2005 and was permitted to return to work. (R.360.) Jones returned to Dr. Leipzig on August 11, 2006 "for unclear reasons" complaining of chronic twitching in his left arm with occasional left shoulder pain. Jones was referred to Dr. Michael Kelly for a pain consultation. (R. 359.)

13

Jones was first evaluated by Dr. Kelly at Comprehensive Pain Management Centers for left shoulder pain. Jones stated that his pain problems dated back to March of 2005. He reported that the neck fusion had helped with the pain and that he had been able to return to work, but that he was continuing to have muscle pull, muscle spasms, and ticking sensations at night. He reported that he was unable to sleep well due to pain. He rated his pain as nearly constant, 50% to 80% of the time, and described it as very intense, intolerable, sharp, shooting, aching, throbbing, cramping, electric, and tingling. A physical examination showed that Jones to be in no acute distress. (R. 374-75.) He was diagnosed with left shoulder biomechanical dysfunction and myofascial pain syndrome and given a left teres major trigger point injection. (R. 377.)

Jones saw Dr. Gregory Alba for the first time on April 19, 2007. Dr. Alba noted that Jones had a history of chronic musculoskeletal pain, especially in the left shoulder. He observed Jones to be in no acute distress. (R. 431, 531.) On January 1, 2008, Jones complained to Dr. Alba of chronic back pain, left arm pain, and weakness. He reported progressive symptoms, especially in his left arm, over the last several months with increasing pain, decreased range of motion, and occasional numbness, burning, and tingling down the arms. Jones reported that pain was quite difficult to manage during the day and that he did a large amount of physical labor which made the pain worse. Dr. Alba diagnosed Jones with chronic back/arm pain and weakness, probably related to radiculitis or possible nerve impingement, prescribed methadone, and recommended an orthopedic consult for further evaluation of the pain. (R. 429, 529.)

Jones saw Dr. Alfred Durham for the orthopedic consult on January 28, 2008. He reported doing well for about the first year after his surgery, but over the past year having some pain radiating to his left side and along the medial border of the scapula and over scapula. Jones described the pain as burning. Dr. Durham thought what Jones was reporting sounded like

sensory dysesthesias.  Because Jones had reported that the use of a TENS unit had been very helpful in reducing his pain along the posterior of the shoulder and scapula, Dr. Durham advised the purchase of home TENS unit.  Dr. Durham noted that "[i]n some respect, [Jones] knows what has worked for him and just wants to obtain it."  If Jones did not improve with the TENS unit, Dr. Durham believed he may have to consider some pain management.  (R. 427-28, 527-28.)

Jones saw Dr. Alba again on February 11, 2008 for a recheck of his left shoulder and neck pain.  Jones reported that he was on methadone for chronic pain management and that the medication was making him somewhat "oozy [sic]."[4]  Dr. Alba's physical exam revealed some minor pain in the subscapular area and trapezius area.  He diagnosed Jones with, inter alia, chronic neck, back, and arm pain.  For Jones's chronic pain, Dr. Alba prescribed a course of physical therapy for further evaluation and treatment; he decreased Jones's methadone and Cymbalta dosage.  Dr. Alba planned to reassess Jones based on the physical therapy referral.  (R. 424, 525.)

Jones reported to Lucas Therapies on March 20, 2008 for his initial evaluation.  (R. 407.)  He was found to have back and neck spasms, and pain and decreased strength secondary to his spinal cord problems at the C6-7 vertebra.  Jones's goal for physical therapy was to decrease his pain and increase his strength in his upper extremity.  (R. 407.)  The record demonstrates that Jones regularly attended physical therapy at Lucas Therapies over the next few weeks.  After his initial visit, he had eleven physical therapy sessions, with the last one occurring on April 23, 2008.  (R. 396-406.)  These records also indicate that Jones acquired an in-home TENS unit on April 9, 2008.  (R. 400.)  At his last physical therapy session Jones reported "doing ok."  (R. 395.)

---

[4] Presumably this should be "woozy."

Jones also saw Dr. Alba again on April 14, 2008, during the period of his physical therapy, for a follow up of his longstanding neck, back, and overall joint pain. Jones reported that his TENS unit helped significantly with his neck and left arm discomfort. Dr. Alba diagnosed him with musculoskeletal joint pain and arthritis. Because Jones reported some stomach irritation with naproxen use, Dr. Alba prescribed methadone instead. He also prescribed Lortab as need for pain. He instructed Jones to continue with his TENS unit and physical therapy. (R. 422, 523.)

Jones saw Dr. Alba once more on May 13, 2008 for a recheck of his chronic muscular back and neck pain. Dr. Alba noted that this pain had improved on Jones's current medication regimen. Jones reported having a TENS unit at home, which was helping, and that he was better able to function during the day due to a decrease in pain. Dr. Alba diagnosed Jones with, inter alia, chronic pain; he continued Jones on his current pain medications. (R. 420, 521.) Jones returned to Dr. Alba on August 15, 2008 to discuss his neck and back pain. Jones reported doing fairly well over the last couple months. Methadone controlled Jones's baseline pain fairly well, and he took Lortab for breakthrough pain. Jones denied radicular symptoms. Dr. Alba prescribed prednisone for overall inflammation in the joints and musculature, which he believed would help with Jones's overall pain and continued Jones's methadone and Lortab. (R. 418, 519.)

On November 24, 2008, Jones saw Dr. Alba to get refills of his medication and to discuss his left shoulder pain, which Dr. Alba noted had been chronic. Dr. Alba noted Jones was not in an acute distress. He diagnosed Joes with chronic left shoulder pain and continued Jones' pain medication, with the exception of substituting Vicodin for Lortab. Dr. Alba planned do an AC joint injection if Jones's pain was not significantly better in two months. (R. 444, 513.)

On December 30, 2008, Jones saw Dr. Steve Osborn for possible broken ribs; he was diagnosed with a contusion. (R. 414.) Jones saw Dr. Alba two months later on February 29, 2009 for a follow up to discuss, inter alia, chronic pain. Jones reported that all his medical problems were "doing well," but that he still had some chronic pain and difficulty with range of motion in his left shoulder. Dr. Alba observed Jones to be in no acute distress. His diagnosis of Jones included chronic pain. He continued Jones on methadone, changed his Vicodin prescription to Lortab, and told Jones to follow up in six months or sooner if needed. (R. 412, 515.)

Jones had his follow up with Dr. Alba on August 3, 2009. He reported mild left-side rib discomfort which was chronic which Dr. Alba had disgnosed as either costochondritis or muscular pain. Jones stated that he was doing well otherwise. Dr. Alba noted that Jones's "pain is well managed." His only diagnosis of Jones was "depression/anxiety," which Dr. Alba noted was "doing well." (R. 444, 513.) Jones saw Dr. Alba again on September 22, 2009 for a hand injury. (R. 442, 511.) There was no acute fracture. (R. 535.)

On November 2, 2009, Jones reported occasional paresthesias, especially down the left arm. Dr. Alba diagnosed him with bicipital tendinitis and paresthesias, and gave him a Kenalog injection. Jones tolerated the procedure well and experienced excellent results. (R. 440, 509.) At follow up on December 14, 2009, Jones reported that he achieved improved pain control for his left shoulder with the combination of methadone and Lortab. Dr. Alba diagnosed Jones with chronic pain and shoulder pain and noted this pain was well managed. (R. 507.)

Jones next saw Dr. Alba on April 4, 2010. Jones reported doing fairly well overall, but that he regularly had breakthrough pain mid-day; Dr. Alba diagnosed him with chronic pain and increased his methadone to deal with the breakthrough pain. (R. 505.) On July 23, 2010, Jones

saw Dr. Alba once more, this time for neck pain.  Jones reported that his medication occasionally made him somewhat nauseous and light headed.  Dr. Alba noted that Jones's pain had "been very well controlled on [his] current medication" and diagnosed Jones with chronic neck pain with degenerative joint changes most likely muscle spasm.  He ordered an x-ray and prescribed Voltaren.  (R. 504.)  The x-ray revealed mild degenerative findings.  (R. 534.)

On October 4, 2010, Jones reported developing chronic back and neck pain with acute right side upper extremity radiculopathy over the past few prior months, as well as progressive numbness, tingling, burning, and some weakness in his right hand.  Dr. Alba diagnosed Jones with chronic neck pain with acute radiculopahty.  He ordered a c-spine x-ray, a lumbosacral MRI and referred him to Dr. Leipzig for further evaluation.  Dr. Alba continued Jones on his current medication, and instructed him to follow up in three months.  (R. 502.)  The c-spine x-rays taken on October 6, 2010 showed no acute process and only degenerative changes.  (R. 533.)

Jones saw Dr. James Leipzig on November 11, 2010.  He reported some shooting pain down his right arm when turning his head to the left and extending his neck.  Dr. Leipzig explained to Jones that if his symptoms increased or did not resolve completely that a either a CT myelogram or MRI should be done.  Jones stated that his symptoms were not overly significant and that he would like to simply observe them for the time being.  Dr. Leipzig told Jones to contact him if the symptoms increased or persisted, at which point they would do either a CT myelogram or MRI.  (R. 484, 501.)

On January 4, 2011, Jones reported to Dr. Alba that he was currently stable on his medication regimen of methadone and Lortab as needed as well as Voltaren and that he was "doing quite well overall at the moment."  Dr. Alba diagnosed Jones with chronic shoulder and neck pain, and noted that the pain was well controlled on the current medication regimen.  Dr.

Alba continued Jones's medication and ordered a urine drug screen to test for metabolites of the medication. (R. 499.)

Jones saw Dr. Caroline Kramer for the first time on July 12, 2011. She found that Jones was stable on his current medication, diagnosed him with chronic neck and back pain, and continued him on his current medication until he could be seen by a pain management physician. On August 25, 2011, Jones saw Dr. Leipzig again. Dr. Leipzig, upon reviewing a CT mylogram taken the day before, diagnosed Jones with status post anterior cervical decompression and C6-C7, left C5-C6 neuroforaminal stenosis, and left C6 radiculopathy with reflex, sensory, and motor deficit. Jones stated that he "would like very much to avoid surgical intervention" and Dr. Leipzig found this to be "certainly reasonable." Consequently, Dr. Leipzig arranged for epidural injections and to see Jones for a follow up. (R. 561.)

Analysis

"While the pain caused by an impairment, independent from any physical limitations imposed by that impairment, may of course render an individual incapable of working, allegations of pain and other subjective symptoms, without more, are insufficient." Craig v. Chater, 76 F.3d 585, 592 (4th Cir. 1996) (citing Myers v. Califano, 611 F.2d 980, 983 (4th Cir.1980)). The Fourth Circuit has recognized a two-step process to determine whether pain has rendered a claimant disabled by pain. Hines v. Barnhart, 453 F.3d 559, 564-66 (4th Cir. 2006). First a claimant must establish with objective medical evidence that he suffers from an impairment that could reasonably be expected to cause pain. Id.; see also Craig, 76 F.3d at 594. "It is only *after* a claimant has met [this] threshold obligation . . . that the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work, must be

19

evaluated." Craig, 76 F.3d at 595 (citing 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1)) (emphasis in original).

During this second step, while the claimant may rely entirely on subjective evidence, objective evidence remains relevant. Hines, 453 F.3d at 565. In other words, while the absence of objective medical evidence of the intensity, severity, degree, or functional effect of pain is not determinative, id., a claimant's allegations about his pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." Craig, 76 F.3d at 595 (citing 20 C.F.R. § 416.929(c)(4)). Furthermore, the claimant cannot make a showing of disability merely by demonstrating that he experiences pain. Green v. Astrue, 3:10CV764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing Hays, 907 F.2d at 1457–58) ("An individual does not have to be pain-free in order to be found 'not disabled.'"), report and recommendation adopted, 3:10CV764, 2011 WL 5599421 (E.D. Va. Nov. 17, 2011). The pain must be so severe as to prevent the claimant from performing any substantial gainful activity.

The ALJ found that Jones suffered from medically determinable impairments which could reasonably be expected to cause the symptoms he alleges, but that Jones's statements concerning the intensity, persistence, and limiting effects of his symptoms are not credible to the extent they are inconsistent with his RFC. Jones underwent neck surgery from which he made a good recovery. (R. 362.) One year after the surgeon discharged Jones from his care, Jones returned with left shoulder and arm pain. Since then, the ALJ noted that Jones has received essentially routine and conservative treatment. (R. 17.) The record supports such a finding. Jones's reports of pain were consistent, but the treatment notes of his physicians show that his

pain responded well to medical treatment including physical therapy and the use of a TENS unit. (R. 400, 422, 523.)  Dr. Alba then established an effective pain medication regimen; he characterized Jones's pain as "well managed" and "very well controlled."  (R. 444, 504, 507, 513.)  In November 2010, Jones reported to Dr. Leipzig of developing pain issues once more, but stated that his symptoms were "not overly significant" and declined to proceed with further medical tests unless his symptoms continued or worsened.  (R. 484, 501.)  On January 4, 2011, Jones told Dr. Alba that his pain was stable on his current medication regimen and that he was "doing quite well over all."  (R. 499.)  Jones and his doctors have continued to manage his pain with non-surgical intervention.  (R. 561.).  Finally, on August 25, 2011, Dr. Leipzig diagnosed a left C6 radiculopathy with reflex, sensory and motor deficit, but Jones declined surgical intervention at that point.  Rather, Jones opted for epidural injections, but the record before the Appeals Council does not indicate that Jones ever received such injections.

The record reflects that while Jones suffers from pain, his symptoms are not so severe as to cause him to seek intensive or extremely invasive treatment.  Since his surgery, Jones and his doctors have successfully managed his pain with physical therapy, the TENS unit, and medication.  The critical inquiry before me is not whether Jones suffers from pain, but whether the record contains substantial evidence to support the ALJ's conclusion that Jones's pain is not so severe as to prevent him from engaging in substantial gainful activity.  The objective medical record contains substantial evidence to support both the ALJ's credibility determination and his ultimate decision that Jones's pain is not so severe as to be disabling.

**New Evidence**

As an alternative to granting summary judgment in his favor, Jones requests that the court remand this case under sentence six of 42 U.S.C. § 405(g) for consideration of new evidence

provided in Exhibits 2-4 to Jones's brief (Dkt Nos. 18-2, 18-3, 18-4). "A claimant seeking a remand on the basis of new evidence . . . must show that the evidence is new and material and must establish good cause for failing to present the evidence earlier." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 n.3 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative; it is material if there is a reasonable possibility it would have changed the outcome of the Commissioner's decision. Id. at 96. Jones has the burden of demonstrating that a remand is appropriate given any new and material evidence. Meadows v. Astrue, CIVA 5:08-CV-01129, 2010 WL 1380117, at *3 (S.D.W. Va. Mar. 31, 2010)

     Jones has submitted to the court: (1) records from Lucas Therapies, P.C., dated from January 30, 2012 through April 11, 2012; (2) Medical records from Caroline Kramer, M.D. of Lewis Gale Physicians, LLC, dated from October 17, 2011 through February 20, 2012; (3) a Medical Source Statement Ability To Do Work Related Activities (Physical) completed by Caroline Kramer, M.D., dated from April 6, 2012; (4) records from John Heil, D.A., LCP, of Psychological Health of Roanoke, dated from February 1, 2012 through March 16, 2012; (5) Medical Source Statement Ability To Do Work Related Activities (Mental) completed by John Heil, D.A., LCP., dated from April 13, 2012; (6) Medical records from James Leipzig, M.D., dated from September 6, 2011 through October 10, 2011; (7) Medical record from Caroline Kramer, M.D. of Lewis Gale Physicians, LLC, dated from April 16, 2012; (8) Medical records from Jane Hurt, LCSW, of Family Services of Roanoke, dated from October 3, 2011 through June 7, 2012; (9) records from John Heil, D.A., LCP, of Psychological Health of Roanoke, dated from April 13, 2012 through June 7, 2012.

     Jones argues that the opinion provided by Dr. Carolina Kramer (Dkt. No. 14-4) contains limitations which would preclude Jones from engaging in any substantial gainful employment.

Pls.' Br. 34. Dr. Kramer provided her opinion on form entitled medical source statement of ability to do work-related activities (physical). Dr. Kramer rendered her opinion on April 6, 2012. She stated that Jones's condition had existed and persisted with the restriction she outlined in the form since at least March 1, 2005. The medical record, however, shows that Dr. Kramer first saw Jones on July 12, 2011, at which point she found him to be stable on his current medication. (R. 558.) Dr. Kramer's opinion is, therefore, not consistent with her treatment notes from the relevant time period. Furthermore, her knowledge of Jones's condition as to any time prior to July 12, 2011 is necessarily limited to a review of Jones's medical record—information available to the ALJ and the multiple state agency physicians that reviewed Jones's disability claim, all of whom found that Jones had less severe limitations. (R. 86-87, 96-97, 111-13.)

Jones provided additional treatment notes from Dr. Kramer which reflect that Dr. Kramer continued Jones on his same medication regimen on October 19, 2011, January 19, 2012, February 22, 2012, and April 22, 2012. Dr. Kramer added physical therapy to her treatment for Jones in February 2012, and noted that by April 22, 2012, the physical therapy had helped Jones in his strength and that he also received benefit from the TENS unit. (Dkt. No. 14-4, 14-8.). These records are well outside the relevant time period, but the consistent record shows that Jones continues to receive the same medications and to stay with conservative treatment. As such, the evidence Jones has provided regarding Dr. Kramer's opinion is not material as there is no reasonable possibility it would have changed the outcome of the Commissioner's decision.

Jones also submitted the opinion of Dr. John Heil who found that Jones's concentration, memory, stress tolerance, and ability to understand, remember, and carry out detailed instructions were undermined by his pain and psychological impairments. However, Dr. Heil expressly states that his opinion as to Jones's condition dates only to February 1, 2012 (Dkt. No.

14-6), which is clearly outside the relevant time period. As to the other records provided by Jones, all of them are also clearly well outside the relevant time period. Jones does not give any reason as to the why this evidence was provided or any explanation as to how it is new or material. For these reasons, the new evidence presented provides no reason for remand.

## RECOMMENDED DISPOSITION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **GRANTING** the Commissioner's motion for summary judgment, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to the Honorable Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection.

Entered: February 20, 2013

/s/ Robert S. Ballou

Robert S. Ballou
United States Magistrate Judge